# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 16, 2018　　　Decided February 19, 2019

No. 17-5207

BASSEM AL-TAMIMI, ET AL.,
APPELLANTS

v.

SHELDON ADELSON, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00445)

*Martin F. McMahon* argued the cause and filed the briefs for the appellants.

*Thomas Pulham*, Attorney, United States Department of Justice, argued the cause for the appellees United States of America and Elliott Abrams. *Mark B. Stern* and *Sharon Swingle*, Attorneys, United States Department of Justice, were with him on brief.

*Jonathan I. Blackman* argued the cause for the appellees Sheldon Adelson, et al. *Alexis L. Collins*, *John E. Hall*, *David M. Zionts*, *A. Jeff Ifrah*, *George R. Calhoun*, *Barry G. Felder*, *Michael J. Tuteur*, *William H. Jeffress*, *Jr.*, *Abbe David Lowell*, *Douglas W. Baruch*, *Joseph J. LoBue*, *Jennifer M. Wollenberg*,

*William J. Kelly*, *III*, *Andrew H. Marks*, *Christopher M. Loveland*, *Mark D. Harris*, *Rachel O. Wolkinson*, *Charles S. Fax*, *Jay P. Lefkowitz*, *Lawrence Marc Zell*, *Lars H. Liebeler*, *David Abrams*, *Jay Alan Sekulow*, *Benjamin P. Sisney* and *David I. Schoen* were with him on brief. *Michael E. Barnsback* and *Liesel J. Schopler* entered appearances.

*Benjamin P. Sisney*, *L. Marc Zell* and *David Abrams* were on the supplemental brief for the defendants-appellees Gush Etzion Foundation, et al.

Before: HENDERSON and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

The plaintiffs, both Palestinian nationals and Palestinian Americans, claim the defendants, pro-Israeli American individuals and entities, are conspiring to expel all non-Jews from territory whose sovereignty is in dispute.[1] They sued in federal district court, pressing four claims: (1) civil conspiracy, (2) genocide and other war crimes, (3) aiding and abetting genocide and other war crimes and (4) trespass. Concluding that all four claims raise nonjusticiable political questions, the district court dismissed the complaint for lack of subject matter jurisdiction. We now reverse.

---

[1] The ownership of the territory, which comprises the West Bank, including East Jerusalem, and the Gaza Strip, is at the heart of a decades-long dispute between the Israelis and the Palestinians. We refer to it as the "disputed territory."

## I. BACKGROUND

The plaintiffs are eighteen Palestinians who mostly reside in the disputed territory and a Palestinian village council. The defendants, all American citizens or entities, are eight high-net-worth individuals, thirteen tax-exempt entities, two banks, eight construction and support firms and a former United States deputy national security advisor.[2] The complaint alleges that the defendants engaged in a conspiracy to expel all non-Jews from the disputed territory. Specifically, the individual defendants (excluding Abrams) funneled millions of dollars through the defendant tax-exempt entities and banks to Israeli villages called "settlements." Armed with this financial assistance, the settlement leaders hired full-time security coordinators who trained a militia of Israeli settlers to kill Palestinians and confiscate their property. The defendant construction and support firms destroyed property belonging to the plaintiff Palestinians and built settlements in its place and, here in the United States, the deputy national security advisor publicly endorsed the settlements. All defendants knew their

---

[2] The individual defendants include Sheldon Adelson, Norman Braman, Lawrence Ellison, Daniel Gilbert, John Hagee, Lev Leviev, Irving Moskowitz and Haim Saban. The tax-exempt entities include American Friends of Ariel, American Friends of Bet El Yeshiva, American Friends of Har Homa, American Friends of Ulpana Ofra, Christian Friends of Israeli Communities, Efrat Development Foundation, Falic Family Foundation, Friends of Israel Defense Forces, Gush Etzion Foundation, Honenu National Legal Defense Organization, Karnei Shomron Foundation, The Hebron Fund and The Jewish National Fund. The banks include Bank Leumi Le-Israel and Bank Hapoalim. The construction and support firms include G4S, RE/MAX, Africa Israel Investments, Veolia Environmental Services, Volvo, Hewlett-Packard, Motorola Solutions and Orbital ATK. The former United States deputy national security advisor is Elliott Abrams.

conduct would result in the mass killings of Palestinians residing in the disputed territory.

The plaintiffs' complaint includes four claims: (1) each defendant, save four of the individual defendants as well as the banks and construction and support firms, engaged in a civil conspiracy to rid the disputed territory of all Palestinians; (2) each defendant committed or sponsored genocide and other war crimes in violation of the law of nations; (3) seven individual defendants, the two banks, four construction and support firms and the former U.S. government official aided and abetted the commission of genocide and other war crimes; and (4) each of the banks and construction and support firms trespassed on the plaintiff Palestinians' property. All plaintiffs bring their claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The American citizen plaintiffs also bring their claims under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256.

The defendants moved to dismiss the complaint for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and the district court granted the motion. *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69 (D.D.C. 2017). The court concluded that the complaint raised at least five nonjusticiable political questions: "(1) the limits of state sovereignty in foreign territories where boundaries have been disputed since at least 1967; (2) the rights of private landowners in those territories; (3) the legality of Israeli settlements in the West Bank, Gaza, and East Jerusalem; [] (4) whether the actions of Israeli soldiers and private settlers in the disputed territories constitute genocide and ethnic cleansing . . . [and (5)] whether contributing funds to or performing services in these settlements is inherently unlawful and tortious." *Id.* at 78.

The district court reached its dismissal decision using the six "political question" factors set forth in *Baker v. Carr*, 369 U.S. 186 (1962). In *Baker*, the United States Supreme Court

explained that a claim presents a political question if it involves:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. at 217. The district court found the first *Baker* factor implicated because "[q]uestions touching upon the history of the ancient city [Jerusalem] and its present legal and international status are . . . committed to the Legislature and the Executive, not the Judiciary" and because "Plaintiffs ask this court to wade into foreign policy involving one of the most protracted diplomatic disputes in recent memory." *Al-Tamimi*, 264 F. Supp. 3d at 78 (internal citations and quotations omitted). It found "several other[]" *Baker* factors implicated, including the third and sixth factors, because it believed a judicial decision might "conflict with the other branches' sensitive positions regarding the legality and implications of the settlements, broader questions of Israel's sovereignty, and the right to private ownership and control over the disputed lands in the region." *Id.* at 78-79. In sum, the district court

concluded, "[i]t is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict." *Id.*at 78 (internal citation and quotation omitted). Accordingly, it dismissed the complaint under Fed. R. Civ. P. 12(b)(1).[3] The plaintiffs then timely appealed.

## II. ANALYSIS

### A. Forfeiture *Vel Non*

Before reviewing the district court's political question analysis, we address a preliminary issue. The defendants argue that the plaintiffs forfeited their challenge to the district court's political question holding by improperly incorporating their argument made at a preliminary stage of their appeal into their opening merits brief. The plaintiffs had initially moved for summary reversal, challenging in full in their supporting brief the district court's political question analysis. In their opening merits brief, the plaintiffs did not repeat their political question argument but instead incorporated it by reference—that is, they directed the court to refer to their brief in support of the earlier motion for summary reversal. The defendants claim the plaintiffs forfeited their political question argument by not making their supporting argument anew—and in full—in their opening merits brief. We disagree.

---

[3] The district court made additional rulings, including (1) substituting the United States as a defendant in place of the former government official pursuant to the Westfall Act, 28 U.S.C. § 2679, and then dismissing the claims against the United States based on sovereign immunity and (2) rejecting the application of the act of state doctrine, which prevents a federal court from declaring invalid the official act of a foreign sovereign, *see Hourani v. Mirtchev*, 796 F.3d 1, 11 (D.C. Cir. 2015). These rulings are not before us as the plaintiffs have not appealed the first and the defendants have not cross-appealed the second.

A party forfeits an argument by failing to raise it in his opening brief. *Herron v. Fannie Mae*, 861 F.3d 160, 165 (D.C. Cir. 2017). Mentioning an argument "in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones" is tantamount to failing to raise it. *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). We ordinarily reject a party's attempt to evade this rule by incorporating by reference an argument made at an earlier stage of the litigation. *See, e.g., Gerlich v. DOJ*, 711 F.3d 161, 173 (D.C. Cir. 2013) (incorporation by reference of argument made in interlocutory appeal insufficient); *Davis v. PBGC*, 734 F.3d 1161, 1167 (D.C. Cir. 2013) (incorporation by reference of argument made in district court insufficient); *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) (incorporation by reference of argument made before agency insufficient). We do this for at least two reasons. First, incorporation by reference can be used to evade word limits. *See, e.g., Gerlich*, 711 F.3d at 173 (rejecting appellants' incorporation explanation that "appellee's counsel would not consent to an extension of the 14,000-word space limitation"); *Davis*, 734 F.3d at 1167 (rejecting incorporation of argument made in district court on basis it "would circumvent the court's rules . . . regarding the length of briefs"). Second, opponents may not have a fair chance to respond to arguments that are incorporated by reference. *See Corson*, 899 F.2d at 50 n.4 (rejecting incorporation of argument made to agency "to prevent 'sandbagging' of appellees . . . and to provide opposing counsel the chance to respond").

In their opening merits brief, the plaintiffs "ask[ed] this Court to reverse the lower court's ruling that the litigation cannot go forward because of the political question doctrine," maintaining that the "issue ha[d] been thoroughly briefed . . . in their memorandum in support of their summary reversal

motion." Appellants' Br. 14. Although we would otherwise reject this maneuver, here we find the plaintiffs' incorporation by reference unobjectionable. First, before merits briefing was due, we warned the parties that we "look[] with extreme disfavor on repetitious submissions." April 12, 2018 Per Curiam Order. Although our order was aimed at the defendants, who were allowed to submit three briefs notwithstanding risk of repetition, it was reasonable for the plaintiffs to believe the warning applied equally to them. Further, the plaintiffs' opening brief was concise enough that they could have inserted their entire summary disposition brief into it without exceeding the word limit. In other words, they were not seeking to, and did not, evade the word limit. Moreover, the defendants' responding merits brief—in the main—defended the district court's political question holding. They therefore had a fair opportunity to respond to the plaintiffs' opposing political question arguments. In light of these considerations, we conclude that the plaintiffs have not forfeited their challenge to the district court's political question holding, the central issue on appeal.

## B.   Political Question Doctrine is Jurisdictional

The district court treated the political question doctrine as jurisdictional and therefore dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(1) before considering whether dismissal for failure to state a claim was appropriate under Fed. R. Civ. P. 12(b)(6). "'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Although the parties do not dispute the district court's treatment of the political question doctrine as jurisdictional, we must always determine our jurisdiction *ex mero motu*.

*Baker*, the fountainhead of the modern political question doctrine, did not definitively resolve whether the doctrine is jurisdictional. Indeed, at one point, the Supreme Court suggested that the doctrine is not jurisdictional. *See* 369 U.S. at 198 (calling it a "justiciability" doctrine and distinguishing a jurisdictional defect like no case or controversy from a justiciability defect, the latter described as the "withholding [of] federal judicial relief . . . [based] upon the inappropriateness of the subject matter for judicial consideration"). At another point, however, *Baker* suggested that the political question doctrine forms part of Article III's case or controversy requirement, implying that it *is* jurisdictional. *Id.* (declaring that the absence of a political question "settles the only possible doubt that [this case] is a case or controversy"); *id.* at 198-99, 208. In *Schlesinger v. Reservists Comm. to Stop the War*, the Court resolved this tension, explicitly treating the political question doctrine as jurisdictional. 418 U.S. 208, 215 (1974) ("[T]he concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies both the standing and political question doctrines upon which petitioners in part rely.").

Although the Supreme Court has not again expressly characterized the political question doctrine as jurisdictional since *Schlesinger*, our Court has done so several times. *See, e.g., bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840–41 (D.C. Cir. 2010) (en banc); *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1262 (D.C. Cir. 2006). Whatever the correctness of treating the political question doctrine as other than jurisdictional, we follow *Schlesinger* and,

accordingly, agree with the district court's treatment of the doctrine as jurisdictional.[4]

## C. Political Question Analysis

Having determined that the political question challenge has not been forfeited and that the doctrine is jurisdictional, we turn to the district court's holding that the plaintiffs' claims in fact present political questions. We review the district court's holding *de novo*. *Starr Int'l Co., v. United States*, 910 F.3d 527, 533 (D.C. Cir. 2018). In so doing, we accept as true the plausible facts alleged in the complaint. *Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004).

---

[4] Perhaps the better view is that, like other justiciability doctrines, some elements of the political question doctrine are jurisdictional and others are prudential. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing, ripeness, mootness, and the political question doctrine. These doctrines are composed both of prudential elements which 'Congress is free to override,' and 'core component[s]' which are 'essential and unchanging part[s] of the case-or-controversy requirement of Article III.'" (citations omitted) (first quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984), second quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C. Cir. 1994), and then quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))). Distinctions among the *Baker* factors may provide a basis for distinguishing the jurisdictional elements of the political question doctrine from the prudential. *See Zivotofsky ex rel. Zivotofsky v. Clinton* (*Zivotofsky I*), 566 U.S. 189, 202-07 (2012) (Sotomayor, J., concurring in part and in the judgment); *id.* at 212-13 (Breyer, J., dissenting). But the Supreme Court has not yet recognized a bisection of the political question doctrine.

The political question doctrine arises from the constitutional principle of separation of powers. The "doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). In deciding whether a controversy presents a political question, "[w]e must conduct 'a discriminating analysis of the particular question posed' in the 'specific case.'" *bin Ali Jaber*, 861 F.3d at 245 (quoting *Baker*, 369 U.S. at 211). Abstraction and generality do not suffice. To be precise, we follow a three-step process. First, we identify the issues raised by the plaintiffs' complaint. Next, we use the six *Baker* factors to determine whether any issue presents a political question. *See El-Shifa*, 607 F.3d at 840–42. Finally, we decide whether the plaintiffs' claims can be resolved without considering any political question, to the extent one or more is presented. Indeed, the political question doctrine mandates dismissal only if a political question is "inextricable from the case." *Baker*, 369 U.S. at 217; *see also U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 456 (1992); *Davis v. Bandemer*, 478 U.S. 109, 122 (1986). In other words, "the political question doctrine is a limited and narrow exception to federal court jurisdiction." *Starr*, 910 F.3d at 533 (citing *United States v. Munoz-Flores*, 495 U.S. 385, 396 (1990)). A court cannot "avoid [its] responsibility" to enforce a specific statutory right "merely 'because the issues have political implications.'" *Zivotofsky ex rel. Zivotofsky v. Clinton* (*Zivotofsky I*), 566 U.S. 189, 196 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

### 1. Issues Raised by Plaintiffs' Complaint

As noted earlier, the district court concluded that the plaintiffs' complaint raises five political questions:

(1) the limits of state sovereignty in foreign territories where boundaries have been disputed since at least 1967; (2) the rights of private landowners in those territories; (3) the legality of Israeli settlements in the West Bank, Gaza, and East Jerusalem; [] (4) whether the actions of Israeli soldiers and private settlers in the disputed territories constitute genocide and ethnic cleansing . . . [and (5)] whether contributing funds to or performing services in these settlements is inherently unlawful and tortious.

*Al-Tamimi*, 264 F. Supp. 3d at 78. The defendants believe this case presents two additional political questions: (6) Do the equities favor Israelis or Palestinians in the West Bank? and (7) Is the root cause of violence in the disputed territory the Palestinian landowners or the Israeli settlers? Although the factual allegations of the complaint undoubtedly bear on these questions, our duty is to analyze the specific claims to determine whether they *require* us to answer them.[5] *See bin Ali Jaber*, 861 F.3d at 245 (requiring "'discriminating analysis of the particular question posed' in the 'specific case'" (quoting *Baker*, 369 U.S. at 211)).

---

[5] The plaintiffs have done this work for us with respect to one issue, expressly waiving any theory of liability premised upon the conduct of Israeli soldiers. *See* Appellants' Reply Br. 2 ("[T]he lower Court here does not have to decide if military activity engaged in in the [disputed territory] is illegal. The reason—it is the belligerent settlers who have: a) stolen thousands of acres of private Palestinian property; b) burned down olive groves; c) poisoned water wells and livestock; d) forged deeds to Palestinian properties; and e) forcibly removed 400,000 Palestinians from the [disputed territory].").

13

In Count I the plaintiffs allege that the defendants engaged in a civil conspiracy to expel all non-Jews from the disputed territory. The elements of civil conspiracy are:

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Count I charges as the requisite "unlawful acts" genocide and theft and destruction of private property. To determine whether Israeli settlers committed genocide, we must answer only one of the seven political questions identified by the district court and the defendants—Question #4 (Do the Israeli settlers' actions in the disputed territory constitute genocide and ethnic cleansing?). And to determine whether Israeli settlers engaged in theft and destruction of private property, we must answer only Question #2 (What are the rights of private landowners in the disputed territory?).

In Count II, the plaintiffs allege that the defendants committed war crimes, crimes against humanity and genocide in violation of the law of nations. Specifically, they allege the defendants committed "murder, ill treatment of a civilian population in occupied territory, pillage, destruction of private property, and persecution based upon religious or racial grounds." And in Count III, the plaintiffs allege that the defendants aided and abetted the crimes alleged in Count II. Counts II and III therefore require the court to determine whether Israeli settlers committed murder, pillage, destruction of private property, persecution based upon religious or racial grounds or ill-treatment of a civilian population in occupied

territory. To determine whether Palestinians constitute a "civilian population in occupied territory," the court must answer only Question #1 (What are the limits of state sovereignty in the West Bank, Gaza and East Jerusalem?). To determine whether the Israeli settlers pillaged or destroyed private property, the court must answer only Question #2 (What are the rights of private landowners in the disputed territory?). And to determine whether Israeli settlers murdered or persecuted Palestinians based upon religious or racial grounds, the court must answer only Question #4 (Do the actions of Israeli settlers in the disputed territory constitute genocide and ethnic cleansing?). Finally, Count IV alleges that the defendants committed aggravated and ongoing trespass. To resolve Count IV, the court must answer only Question #2 (What are the rights of private landowners in the disputed territory?).

Thus, only three of the seven purported political questions identified by the district court or the defendants are questions—political or otherwise—potentially presented by this case. Of the three, two (Questions #1 and #2) can be reduced to a single question: *who has sovereignty over the disputed territory*? The other (Question #4) can be restated as: *are Israeli settlers committing genocide*? A close reading of the two-hundred-page complaint confirms that these are the only two potential political questions raised by the plaintiffs' claims. To determine if these two questions are jurisdiction-stripping political questions, we turn to the *Baker* factors.

## 2. Application of *Baker* Factors

### a. First Two Factors

The first *Baker* factor requires us to determine whether there is a textually demonstrable commitment of the question to either the Executive Branch or the Legislative Branch.

*Baker*, 369 U.S. at 217. The second *Baker* factor requires us to determine whether there are judicially manageable standards to answer the question. *Id.* Together, these factors often dictate that a case touching on foreign affairs presents a political question. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *El-Shifa*, 607 F.3d at 841 ("Disputes involving foreign relations . . . are 'quintessential sources of political questions.'" (quoting *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006))). Indeed, the Constitution expressly commits certain foreign affairs questions to the Executive or the Legislature. *See* U.S. Const. art. I, § 8 (the Congress's power to "regulate Commerce with foreign Nations," "declare War," "raise and support Armies," "provide and maintain a Navy" and "make Rules for the Government and Regulation of the land and naval Forces"); U.S. Const. art. II, § 2 (the President's power to "make Treaties" and "appoint Ambassadors" and the President's role as "Commander in Chief of the Army and Navy of the United States"). Moreover, resolution of questions touching foreign relations "frequently turn[s] on standards that defy judicial application." *Baker*, 369 U.S. at 211. But not every case that involves foreign affairs is a political question. *Id.* ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."); *Hourani v. Mirtchev*, 796 F.3d 1, 9 (D.C. Cir. 2015) ("Adjudicating the lawfulness of those acts of a foreign sovereign that are subject to the United States' territorial jurisdiction . . . is not an issue that the Constitution entirely forbids the judiciary to entertain."); *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) ("[W]e do not automatically decline to adjudicate legal questions if they may implicate foreign policy or national security."). How do we determine whether a case involving foreign affairs is a political question? Our en banc court has answered that question: policy

choices are to be made by the political branches and purely legal issues are to be decided by the courts. *El Shifa*, 607 F.3d at 842 ("We have consistently held . . . that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security. In this vein, we have distinguished between claims requiring us to decide whether taking military action was 'wise'—'a policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch'—and claims '[p]resenting purely legal issues' such as whether the government had legal authority to act." (alterations in original) (quoting *Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring))). This is the distinction on which this litigation turns.

The first potential political question presented—*who has sovereignty over the disputed territory*—plainly implicates foreign policy and thus is reserved to the political branches. As the Supreme Court has explained, in our constitutional system questions regarding the "legal and international status [of Jerusalem] are . . . committed to the Legislature and the Executive, not the Judiciary." *Zivotofsky ex rel. Zivotofsky v. Kerry* (*Zivotofsky II*), 135 S. Ct. 2076, 2081 (2015). What is true of Jerusalem specifically is true of the entirety of the disputed territory. In fact, the Executive Branch recently addressed the question *who has sovereignty over the disputed territory*. *See* Statement by President Trump on Jerusalem (Dec. 6, 2017), https://www.whitehouse.gov/briefings -statements/statement–president–trump–jerusalem ("We are not taking a position [on] any final status issues, including the specific boundaries of the Israeli sovereignty in Jerusalem, *or the resolution of contested borders*." (emphasis added)).

On the other hand, the second potential political question presented—*are Israeli settlers committing genocide*—is a purely legal issue. As noted earlier, one of the bases of the

plaintiffs' complaint is the Alien Tort Statute. The ATS provides in part that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations." 28 U.S.C. § 1350. An ATS claim, then, incorporates the law of nations. And it is well settled that genocide violates the law of nations. *Simon v. Republic of Hungary*, 812 F.3d 127, 145 (D.C. Cir. 2016) ("[T]he relevant international-law violation for jurisdictional purposes is *genocide*."); *see also Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401–02 (2018). Genocide has a legal definition. *See* United Nations Convention on the Prevention and Punishment of the Crime of Genocide art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, 280 (defining genocide, in part, as "[k]illing members of [a national, ethnic, racial or religious group]" "with intent to destroy [the group], in whole or in part"). Thus, the ATS—by incorporating the law of nations and the definitions included therein—provides a judicially manageable standard to determine whether Israeli settlers are committing genocide. We recognize that the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). We are well able, however, to apply the standards enunciated by the Supreme Court to the facts of this case.[6] The first two *Baker* factors,

---

[6] This is not to suggest that a statutory claim can never present a political question. *But see El-Shifa*, 607 F.3d at 855–57 (Kavanaugh, J., concurring in the judgment). Although a statutory claim is less likely to present a political question—both because statutory interpretation is generally committed to the judicial branch and because statutory language is likely to include judicially manageable standards—a statutory claim can present a political question if resolving the claim requires the court to make an integral policy choice. *See id.* at 843 (court could not resolve integral policy choice whether terrorist activity "threatens the security of United States nationals or the national security of the United States," an

then, suggest that this case presents only one political question: *who has sovereignty over the disputed territory*.

### b. The Four Prudential Factors

The last four *Baker* factors—the prudential factors—are closely related in that they are animated by the same principle: as a prudential matter, the Judiciary should be hesitant to conflict with the other two branches. *See Baker*, 369 U.S. at 217. Traditionally, the existence of one of the prudential factors indicates that a question is a political question. *Schneider*, 412 F.3d at 194 ("The *Baker* analysis lists the six factors in the disjunctive, not the conjunctive. To find a political question, we need only conclude that one factor is present, not all."). In its most recent discussion of the *Baker* factors, however, the Supreme Court did not discuss the prudential factors. *Zivotofsky I*, 566 U.S. at 195 ("We have explained that a controversy 'involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993))). Because the Supreme Court "does not normally overturn, or [] dramatically limit, earlier authority *sub silentio*," we do not interpret the omission as eliminating the prudential factors. *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Nor can we say, however, that the omission was unintentional. *See Zivotofsky I*, 566 U.S. at 202–07 (Sotomayor, J., concurring in part and in the judgment) (commenting on majority opinion's omission of prudential

---

element of a claim under the Antiterrorism and Effective Death Penalty Act (quoting 8 U.S.C. § 1189(a)(1)(C))); *Schneider*, 412 F.3d at 196–97 (court could not resolve integral policy choice whether military action was "wrongful," one element of wrongful death claim under Federal Tort Claims Act).

factors); *id.* at 212 (Breyer, J., dissenting) (same); *cf. Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008) (calling first two factors "most important"). At the very least, *Zivotofsky I* suggests that, if the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch. *See* 566 U.S. at 194–201 (no political question notwithstanding Judiciary's decision that plaintiff's passport can list "Jerusalem, Israel" as his birthplace would appear inconsistent with Executive's decision—at that time—not to recognize Jerusalem as part of Israel).

In analyzing the prudential *Baker* factors, the official position of the Executive is highly relevant. The Executive is institutionally well-positioned to understand the foreign policy ramifications of the court's resolution of a potential political question. Accordingly, an Executive Branch opinion regarding these ramifications is owed deference, no matter what form it takes. *See Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005) (Executive offered opinion in Statement of Interest, opinion was "compelling" and rendered case nonjusticiable under political question doctrine"); *see also Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 62 (D.C. Cir. 2011) (Executive offered opinion in Statement of Interest and amicus briefs and court invited it to reassert concerns on remand), *vacated on other grounds*, 527 F. App'x 7, 7 (D.C. Cir. 2013); *cf. In re Papandreou*, 139 F.3d 247, 252 (D.C. Cir. 1998) (Executive offered opinion regarding Foreign Sovereign Immunities Act defense as amicus and court gave its "factual estimation" "substantial weight" but treated its "legal conclusions" as "no more authoritative than those of private litigants"). Here, the Department of Justice expressed its opinion that judicial resolution of the plaintiffs' complaint could create an inter-branch conflict because, "[g]iven the level of political and military support provided Israel by the American government, a judicial finding that the Israeli armed forces had committed

the alleged offenses would 'implicitly condemn American foreign policy by suggesting that the [government's] support of Israel is wrongful.'" Gov't Appellee's Br. 16. This concern, although entitled to deference, is now moot as the plaintiffs have waived any theory of liability based on the conduct of the Israeli military. *See supra*, note 5.

Ultimately, we believe that the court would create an inter-branch conflict by deciding *who has sovereignty over the disputed territory*. By answering the question—regardless of the answer—the court would directly contradict the Executive, which has formally decided to take no position on the question. We do not believe, however, that the court would necessarily create an inter-branch conflict by deciding *whether Israeli settlers are committing genocide*. A legal determination that Israeli settlers commit genocide in the disputed territory would not decide the ownership of the disputed territory and thus would not directly contradict any foreign policy choice. In light of the statutory grounds of plaintiffs' claims coupled with *Zivotofsky I*'s muteness regarding *Baker*'s four prudential factors, we believe that *whether Israeli settlers are committing genocide* is not a jurisdiction-stripping political question. Accordingly, although the question *who has sovereignty over the disputed territory* does present a "hands-off" political question, the question *whether Israeli settlers are committing genocide* does not.

### 3. Extricability of the Political Question

Having considered the *Baker* factors, we conclude that the plaintiffs' claims present only one jurisdiction-stripping political question: *who has sovereignty over the disputed territory*. But a claim whose resolution also includes resolution of a political question can be dismissed on that basis only if the political question is "inextricable." *Baker*, 369 U.S. at 217; *Davis*, 478 U.S. at 122; *U.S. Dep't of Commerce*, 503 U.S. at

456. We believe this political question is extricable. From what we can tell, the court *could* rule in the plaintiffs' favor on all counts without addressing *who has sovereignty over the disputed territory*. Indeed, the court could rule in the plaintiffs' favor on at least Counts I, II and III, without touching the sovereignty question, if it concluded that Israeli settlers are committing genocide. Although the court might have to make a sovereignty determination in order to resolve some of the property-based allegations in Count IV, that might not be true for every allegation. If it becomes clear at a later stage that resolving any of the plaintiffs' claims requires a sovereignty determination, those claims can be dismissed based on the political question doctrine. As it stands now, however, none of their claims can be dismissed on this basis.

For the foregoing reasons, we reverse the judgment of dismissal and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*